**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

KIMBERLY YOUNG, et al.,

               Plaintiffs,

v.

MONMOUTH COUNTY, et al.,

               Defendants.

Civil Action No. 24-4975 (MAS) (TJB)

**OPINION**

**SHIPP, District Judge**

    This matter comes before the Court on the Monmouth County Defendants'[1] Motion to dismiss (ECF No. 7) Plaintiffs'[2] complaint (ECF No. 1) in this prisoner civil rights matter. Plaintiffs filed a response to Defendants' Motion (ECF No. 16), to which Defendants replied (ECF No. 19). For the following reasons, the County Defendants' motion shall be granted in part and denied in part.

**I.    BACKGROUND**

    This matter arises out of the overdose death of Egner while housed in the Monmouth County Correctional Institution ("MCCI") in April 2022. (ECF No. 1 at 6.) In February 2020, Egner was sentenced to six years incarceration for the distribution of controlled dangerous

---

[1] These Defendants include Monmouth County, the Monmouth County Sheriff's Office, the Monmouth County Board of County Commissioners, Sheriff Shaun Golden, Undersheriff Theoadore Freeman, Warden Victor Ianello, and the John Doe Correction Officer Defendants.

[2] Plaintiffs in this matter are Kimberly Young, as administratrix of the Estate of David Egner ("Egner"), and as guardian of their minor child, A.E., and A.E. individually.

substances, but was eventually deferred into an intensive supervision program. (*Id.* at 10.) Following several instances of violating that program through drug use, Egner was taken back into custody and placed into the MCCI in April 2022. (*Id.*) On April 17, 2022, Egner sought out and obtained drugs, specifically "fentanyl-laced heroin" from a fellow inmate, Alvino Hinton ("Hinton"). (*Id.*) At 9:05 a.m. that morning, Egner was found unresponsive in his cell. It is not entirely clear what occurred in the immediate aftermath of this discovery, but Plaintiffs allege that jail medical staff, employed by Defendant CFG, were alerted to the situation but did not appropriately respond either because they did not use Narcan upon Egner or did not use sufficient doses of Narcan to revive Egner. (*Id.* at 10-11.) Plaintiffs do not detail what steps were taken during those early moments or the timeline for CFG's response, but do allege that Egner was transferred to CentraState Medical Center in Freehold, where he died three days later, on April 20, 2022. (*Id.* at 11.) Egner's death was determined to be the result of "mixed drug toxicity" arising out of ingesting fentanyl, acetylmorphine, and other opioids. (*Id.*) A search of Hinton later produced "36 wax folds of heroin" which had been concealed in Hinton's underwear. (*Id.* at 10.) Hinton later admitted to smuggling the drugs into the jail himself. (*Id.* at 15.) Hinton was thereafter charged with, and convicted of, causing Egner's death. (*Id.*)

  The remainder of Plaintiffs' complaint attempts to lay the blame for Egner's overdose on various supervisory Defendants and the entity responsible for overseeing the jail and its medical staff. Specifically, Plaintiffs allege that Defendants were, or should have been, aware that drug abuse was widespread at MCCI, and that "CDS was widely available to the MCCI inmate population" but provide very few specific factual allegations to support these conclusions. (*Id.* at 12.) In support of these contentions, Plaintiffs allege that Sheriff Golden of Monmouth County was quoted in a 2018 Asbury Park Press article as stating that "76 percent of inmates in county jails face addiction" and that the same article expressed the opinion that addiction problems were

particularly high in those charged with drug offenses. (*Id.*) Plaintiffs also point to a January 2024 article in the New Jersey Monitor in which they allege that Undersheriff Freeman wrote about an "entrenched drug trade" in the jail which resulted in overdoses and lawsuits. (*Id.*)

In their reply, Defendants provided the Court with copies of the two articles upon which Plaintiffs relied. The 2018 Asbury Park Press article was not specifically concerned with the drug trade in jail, but rather with a voluntary addiction recovery program put into place in the jail, which Sheriff Golden praised as a means to help inmates with addiction issues. (*See* ECF No. 19-1 at 2.) It was the article's author, however, and not Golden, who stated that "76 percent of inmates in county jails face addiction," and nothing in the article indicates that Golden in any way endorsed or agreed with this statistic, nor was the statistic specifically aimed at MCCI itself. (*Id.*)

The 2024 New Jersey Monitor article is largely a summary of another federal lawsuit regarding the overdose death of a female inmate, Jennifer Ross, in MCCI in September 2022. (*Id.* at 7.) Other than summarizing the allegations of that lawsuit, which Plaintiffs also recapitulate in their complaint, the article briefly notes that Undersheriff Freeman authored an article in 2017 regarding drug trade in the jail, and notes that since 2017, several jail officers who attempted to smuggle drugs into the jail in potato chip bags were arrested and prosecuted. (*Id.* at 9.) Defendants also provided a copy of Freeman's 2017 article, which was referenced by the Monitor and indirectly by Plaintiffs through the Monitor article, which does not concern itself with a rampant drug trade, but instead merely details new X-ray screening devices at the jail aimed at increasing the discovery rate of contraband of all types entering the jail in inmates' body cavities. (*Id.* at 13-14.) The only actual incidents of drug abuse mentioned in either article occurred in either 2013, nearly a decade before Egner's incident, or 2022, in the case of Ross's death which took place several months after Egner's passing.

3

Aside from these articles and the allegations made in the Ross lawsuit, in describing MCCI as a haven of drug smuggling and abuse, Plaintiffs rely upon the arrest and prosecution of corrections officer Bryant Mack ("Mack"). Mack was indicted on drug distribution charges in March 2022 arising out of alleged drug smuggling in which he engaged with another staff member in 2020 and 2021. (*Id.* at 14.) Mack, however, had been smuggling suboxone, marijuana, and "K2," not heroin or fentanyl. (*Id.* at 15.) Plaintiffs do not allege that Mack was involved in any way with Egner or Hinton.

While Plaintiffs plead that the supervisory Defendants failed to adopt sufficient policies to address the drug issues—such as increased cell checks, searches, better detection equipment, the greater use of drug dogs, and the like—Plaintiffs plead facts indicating that the jail did, in fact, have policies aimed at dealing with the issue of drug dependency by inmates. Specifically, Plaintiffs acknowledge in pleading claims against the John Doe Officers that the jail had standard procedures requiring the frequent and repeated monitoring of inmates with known drug histories, frequent cell checks, restrictions on free movement for those admitted with addiction issues, policies requiring staff to be prepared to summon medical aid as needed as soon as an overdose was discovered, rules requiring the reporting of drug abuse and overdoses, and various rules and equipment aimed at detecting and eliminating contraband, including drugs, from the facility. (*Id.* at 29-30.) Plaintiffs also allege, at least indirectly, that the jail did have policies in place for the discovery, firing, and prosecution of staff members, including Mack, who were found to be smuggling and otherwise facilitating drug use in the jail. (*Id.* at 14-15.)

II.     **LEGAL STANDARD**

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is required to accept as true all factual allegations in the complaint and draw all reasonable inferences from those allegations in the light most favorable to the plaintiff, *see Phillips*

4

*v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008), but need not accept as true legal conclusions couched as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986). A complaint need not contain "detailed factual allegations" to survive a motion to dismiss, but must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint "that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" and a complaint will not "suffice" if it provides only "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 555, 557 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). A complaint that provides facts "merely consistent with" the defendant's liability "stops short of the line between possibility and plausibility" and will not survive review under Rule 12(b)(6). *Id.* (quoting *Twombly*, 555 U.S. at 557).

### III. DISCUSSION

#### A. Failure to Protect

Defendants first argue that Plaintiffs fail to state a claim for failure to protect against the County Defendants as Plaintiffs have not pled a plausible claim for supervisory or municipal

5

liability under 42 U.S.C. § 1983.³ A defendant in a civil rights action must have personal involvement in the alleged wrongs in order to be held liable as federal civil rights law does not permit a defendant to be held liable solely on a *respondeat superior* basis. *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015); *Rode v. Dellarciprete*, 845 F.2d 1195, 1207-08 (3d Cir. 1988). Claims against supervisory or municipal defendants thus generally require a plaintiff to plead facts showing that either a supervisor had actual knowledge of and acquiesced in an underling's wrongdoing, or the supervisor or municipal entity was responsible for a policy, practice, or custom which was the moving force behind the violation of the plaintiff's rights. *Chavarriaga*, 806 F.3d at 222-23; *see also Los Angeles County v. Humphries*, 562 U.S. 29, 35-36 (2010); *City of Canton v. Harris*, 489 U.S. 378, 389 (1989); *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583-84 (3d Cir. 2003). To plead such a claim, a plaintiff must allege facts indicating that the supervisory or municipal defendant either adopted or put in place a policy, custom or practice which gave rise to the alleged violation; or that there was an obvious and clear need for the affirmative promulgation of a new policy to address deficiencies which, if left uncorrected, were so likely to cause a violation such as the one the plaintiff suffered that the defendant in question can be said to have been deliberately indifferent to the deficiency. *Chavarriaga*, 806 F.3d at 222-23; *Natale*, 318 F.3d at 584.

One subspecies of this latter sort of claim is a claim based on a municipality or supervisor's failure to train his subordinates. A "municipality's culpability is at its most tenuous where a claim

---

³ Plaintiffs raise their civil rights claims under both § 1983 and the New Jersey Civil Rights Act ("NJCRA"). The NJCRA is New Jersey's analogue to a federal civil rights claim under § 1983. With rare exceptions not applicable here, a claim under the NJCRA is construed identically to an equivalent federal claim and is subject to the same defenses. *See, e.g., Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443-44 (D.N.J. 2011). As such, although this Court explicitly discusses Plaintiffs' civil rights claims in relation to § 1983, the Court's conclusions apply equally to Plaintiffs' equivalent NJCRA claims. Thus, where this Court dismisses one of Plaintiffs' civil rights claims, this Court dismisses that claim under both § 1983 and the NJCRA.

turns on a failure to train," and will only be tenable where it is clear from the facts alleged that the failure to train amounts to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Connick v. Thompson*, 563 U.S. 51, 61-62 (2011) (internal quotations omitted). This requires allegations sufficient to support an inference that the municipality or supervisor "disregarded a known or obvious consequence of [its] action," which requires actual or constructive notice of an obvious deficiency in its training programs and a "policy of inaction" in the face of that known deficiency. *Id.* "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train," as it is policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees" which is indicative of deliberate indifference. *Id.* at 62 (internal quotations omitted). A mere pattern of a handful of vaguely similar constitutional violations is generally insufficient to meet this requirement. *Id.* (holding that having four convictions overturned for *Brady* violations over ten years was insufficient to support a failure to train claim where those violations were dissimilar to the specific *Brady* violation at issue). While the Supreme Court has suggested that it is possible that a single incident may support a failure to train claim in an extreme case—such as where police officers are armed with deadly weapons but given no training in regard to the limitations on the use of excessive force—such a claim is not viable in the absence of an extremely obvious deficiency. *Id.* at 63-64.

Here Plaintiffs' claims arise out of allegations that the County Defendants failed to protect Egner from access to illicit drugs while incarcerated in violation of his Fourteenth Amendment rights. A plaintiff seeking to raise a failure to protect claim must allege facts showing that he "was incarcerated under conditions posing a substantial risk of serious harm, [that the defendant] was deliberately indifferent to that substantial risk to his health and safety, and . . . the [defendant's]

7

deliberate indifference caused him harm." *See* 696 F.3d 352, 367 (3d Cir. 2012), *abrogated in part on other grounds as recognized in Mack v. Yost*, 968 F.3d 311, 319 n.7 (3d Cir. 2020); *see also Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Corbin v. County of Bucks*, 703 F. Supp. 3d 527, 534 (E.D. Pa. 2023). While the threat of unfettered access to drugs in a controlled environment of incarceration may give rise to a failure to protect claim under certain circumstances, simple exposure to drugs while incarcerated or a "run-of-the-mill drug-overdose case" will not be sufficient to support a failure to protect claim in the absence of detailed facts showing that the defendants knew of serious and widespread access to illegal drugs and knew that those drugs were actively being abused, such as in a case where numerous inmates suffer overdoses in a relatively short time frame. *See Caraway v. CoreCivic of Tenn.*, 98 F.4th 679, 684 (6th Cir. 2024).

In their complaint, Plaintiffs rely not on an affirmative policy, but rather on the alleged failure of the County Defendants to create further policies or train their staff in light of an alleged need to combat drug exposure in the county jail. The facts that Plaintiffs plead, and the actual text of the articles on which Plaintiffs rely, however, do not make out such a claim. As discussed above, Plaintiffs' allegations and the articles in question do not show widespread overdoses, nor do they support Plaintiffs' conclusory allegations that drug abuse and distribution was rampant in the county jail. A careful review of the complaint and underlying articles indicates that there were two overdoses nearly ten years before Egner's death, another overdose which occurred months *after* Egner's overdose, and that at least two staff members had been arrested and prosecuted for smuggling illicit substances completely different from those involved in Egner's case well over a year before Egner's overdose. These incidents are spread out over the course of a decade and the case of the one truly similar incident Plaintiffs cite occurred only after Egner's death. These incidents, therefore, are not sufficient to show an obvious need for further policies or training, and

8

thus do not support the inference that the County Defendants were deliberately indifferent to a risk to Egner's health or safety.

This is especially so because the articles on which Plaintiffs rely and their own complaint indicate that the jail had adopted numerous policies and taken actions specifically aimed at combating the threat of drugs. The articles Plaintiffs cite indicate that the county jail adopted treatment programs and put in place high tech detection equipment to inhibit the smuggling of illicit substances. Plaintiffs' own complaint indicates that standard jail policies in place at the time of Egner's overdose required monitoring of inmates suspected of undergoing detoxification from drugs, frequent cell checks on such inmates, controlled movement of detoxifying inmates, the reporting and recording of incidents of drug exposure, the searching of incoming inmates and others entering the jail to deter the smuggling of illicit drugs, and immediate contact with medical staff in the event of an incident. (*See* ECF No. 1 at 30.) Taking these facts and policies in question, it was not sufficiently obvious from the course of past incidents that further training or policy adoption was so necessary that the supervisory and municipal County Defendants can be said to have been deliberately indifferent to Egner's needs. Plaintiffs' failure to protect claims against the County supervisory and municipal Defendants (Monmouth County, Monmouth County Sheriff's Office, Sheriff Golden, Undersheriff Freeman, and Warden Iannello) are therefore dismissed without prejudice.

Defendants also move to dismiss Plaintiffs' claims against the individual John Doe Corrections Officers[4] for failure to protect. Even assuming Plaintiffs have sufficiently pled facts

---

[4] In their argument, Defendants at least suggest that this claim should also be dismissed as to the non-moving medical Defendants. The medical Defendants did not move to dismiss and instead filed an answer. Defendants have provided no basis for moving on behalf of those otherwise represented Defendants. The Court, therefore, does not address the County Defendants' arguments as to the medical Defendants, and addresses only the claims against the moving County Defendants.

9

indicating that the individual officers knew or should have known that Egner had a history of drug use and was detoxing at the time he entered the jail, Plaintiffs fail to adequately plead facts, as opposed to conclusory allegations, to suggest the John Doe officers were aware of Egner's possible exposure to drugs. While Plaintiffs frequently conclude that drug abuse and smuggling was rampant in the jail, the actual facts pled in the complaint, as discussed above, do not support that conclusion, and Plaintiffs have pled no facts indicating that any officer knew or should have known that Hinton possessed any drugs, or that Egner had access to Hinton's drugs. In the absence of factual allegations that Hinton's possession of drugs was known to officers, or facts, as opposed to conclusory allegations, to support the idea of rampant drug use and abuse in the jail, Plaintiffs fail to state a plausible claim for relief against the individual officer defendants. Here, Plaintiffs have not pled facts sufficient to show that the officers were deliberately indifferent to the threat Hinton's drugs posed to Egner.[5] Plaintiffs' failure to protect claim against the individual John Doe Officers must therefore also be dismissed without prejudice at this time.

### B. Failure to Provide Adequate Medical Care

Defendants next move to dismiss any civil rights claim against the individual officers Plaintiffs have raised based on a failure to provide adequate medical care. The complaint did not explicitly raise a separate civil rights claim for denial of medical care against these officers and instead did so only as to the medical defendants who filed an answer. In response to the motion to dismiss, however, Plaintiffs appear to agree that certain factual allegations were intended to set out such a claim. (*See* ECF No. 16 at 46–47.) To make out a Fourteenth Amendment medical claim, a plaintiff must plead facts which, if proven, would demonstrate how the defendants were

---

[5] That the officers did not timely check on Egner or properly keep an eye on him during the morning of the event may support an inference of negligence depending on the time frame involved. The complaint is not very specific as to the times at which the events occurred on the morning in question, but those facts are not sufficient to show deliberate indifference.

deliberately indifferent to his medical needs. *See Natale*, 318 F.3d at 582. This requires facts showing both that the plaintiff had a sufficiently serious medical need and that the defendants engaged in acts or omissions which would permit the inference that they knew of and disregarded "an excessive risk to inmate health or safety." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). A medical need is sufficiently serious where it "has been diagnosed as requiring treatment or [is a need that] is so obvious that a lay person would easily recognize the necessity of a doctor's attention." *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987), *cert denied*, 486 U.S. 1006 (1988). As deliberate indifference "requires more than inadequate medical attention or incomplete medical treatment," *see King v. County of Gloucester*, 302 F. App'x 92, 96 (3d Cir. 2008), a plaintiff who pleads facts amounting to only negligence or medical malpractice will fail to make out a claim for relief under § 1983. *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

  Plaintiffs admit that, to the extent they have a medical claim against the correction officer John Does, that claim is based on the delay of the officers in discovering Egner unconscious in his cell. (ECF No. 16 at 47.) Plaintiffs' medical claim against the officers is thus based on the time *before* they discovered Egner. Plaintiffs' claim, therefore, is not based on their knowledge of and indifference to Egner's medical state, but rather their failure to follow watch rules and thereby delayed discovery of Egner's condition. Although the complaint is not entirely clear, it appears from Plaintiffs' allegations that the officers called for help from medical staff upon Egner's discovery, and it was the medical staff, rather than the officers, who were responsible for the delay following the officers finding him unconscious. The failure to timely discover the unconscious Egner may support an assertion of negligence on the part of the corrections officers, but it does not suggest that they knew of and ignored a serious medical risk to Egner's health, and thus is insufficient to support deliberate indifference to medical needs claims. Plaintiffs' deliberate

11

indifference to medical needs claims against the John Doe Officer Defendants are therefore dismissed without prejudice.

### C. State-created Danger

Defendants next argue that the Court should dismiss Plaintiffs' state created danger civil rights claim. Under a state created danger theory, a plaintiff can show a due process violation where: (1) there is a relationship between the state and the plaintiff that existed indicating that the plaintiff was a foreseeable victim of the defendants' actions; (2) a state actor affirmatively used his authority in a way that created a danger to the plaintiff that rendered the plaintiff more vulnerable to danger than he would have been had the state not acted; (3) a state actor acted with a degree of culpability which shocks the conscience; and (4) this caused harm to the plaintiff which was foreseeable and a fairly direct result of state action. *See Bright v. Westmoreland County*, 443 F.3d 276, 281 (3d Cir. 2006); *see also DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195-201 (1989). "It is important to stress . . . that under the [affirmative action element] of a state-created danger claim, [l]iability . . . is predicated upon the states' *affirmative* acts[,] . . . [and i]t is a misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause." *Bright*, 443 F.3d at 282.

Plaintiffs' claim is essentially based on the idea that the state created a facility "riddled and infested" with illicit drugs, Defendants were aware that they had created such a facility, and then placed Egner, a known drug addict, into that facility. (*See* ECF No. 16 at 56.) As explained above, Plaintiffs have failed to allege facts, as opposed to conclusory allegations, to support that characterization. Absent factual allegations which would permit the inference that the jail was actually overrun with illicit drugs—such as numerous specific instances of drugs being discovered, numerous close in time drug reactions or overdoses, or the like—this Court cannot infer that Defendants actually created the dangerous situation Plaintiffs suggest. Likewise, Plaintiffs' claims

12

largely depend on *inaction*—the failure of Defendants to adopt further policies or pursue greater training, or the failure to increase drug interdiction efforts—rather than actual state misuse of power. Such inaction is insufficient to support a state created danger claim under the Due Process clause. *Bright*, 443 F.3d at 282. As Plaintiffs have not alleged sufficient facts to support the inference that Defendants created a situation which directly led to Egner's overdose, and have also failed to allege that the misuse, rather than failure to use, state power created the harm, Plaintiffs have failed to plead a plausible state created danger claim and that claim is dismissed without prejudice as to the County Defendants.

      **D.    Access to Courts/Conspiracy**

Defendants also move to dismiss Plaintiffs' civil rights claim for conspiracy to impair Plaintiffs' access to the Courts. Plaintiffs' claim in that respect essentially relies on the allegation that they filed OPRA requests seeking the names of all staff involved in the Egner overdose, Defendants objected to providing this information, Defendants thereafter did not respond to further pre-suit inquiries requesting the information, and that this amounts to a conspiracy to deny access to the courts. (*See* ECF No. 1 at 38-39; 50-51.) There are two types of denial of access to the courts claims. The first asserts that systemic official action is frustrating a group of plaintiffs from timely preparing and filing suit. The second addresses claims arising out of "specific cases that cannot now be tried . . . no matter what official action may be in the future." *Christopher v. Harbury*, 536 U.S. 403, 413-14 (2002). Plaintiffs' claims fall into the second category. To make out such a claim, a plaintiff must show that state action impeded his ability to litigate an at least arguably meritorious claim, and that he suffered actual injury – either the loss or inadequate settlement of that meritorious case, or the loss of an opportunity to seek some specific form of relief in a meritorious case. *Id.*; *see also Thompson v. Ferguson*, 849 F. App'x 33, 35 (3d Cir. 2021) (actual injury in the form of loss of an arguable claim for relief).

Here, Plaintiffs have neither lost nor inadequately settled, nor lost the opportunity to pursue a viable form of relief. Their alleged injury is essentially the current, pre-discovery inability to identify the John Doe officers to determine their identities and bring suit against them. That Plaintiffs have filed suit in this matter, and raised their claims against the John Doe Defendants indicates that they have not lost this claim, in principle or in part. Plaintiffs can pursue the records they seek in discovery in this matter as the medical Defendants have not moved to dismiss. In addition, Plaintiffs may seek to amend their complaint to address the deficiencies as to the unidentified officer Defendants either in the immediate future or during discovery. Plaintiffs' alleged injury—the inability to identify specific Defendants by name—is adequately protected through fictitious party pleading. As Plaintiffs have failed to plead facts showing actual injury—that they lost their claims in total or in part because of the failure of jail officials to identify their employees pre-suit—they fail to state a claim for denial of access to the courts, and those claims, including Plaintiffs' conspiracy claims, are dismissed without prejudice at this time.[6] *See Edwards v. New Jersey*, No. 22-2396, 2022 WL 3704634, at *4 (D.N.J. Aug. 26, 2022) (under federal civil rights law and New Jersey law, a civil conspiracy claim cannot stand without a viable, plausible underlying tort claim).

E.  **State Law Claims**

Finally, Defendants argue that Plaintiffs' state claims against the County Defendants should be dismissed as they believe they are entitled to immunity under the New Jersey Tort Claims Act. The New Jersey Tort Claims Act serves as a limited waiver of sovereign immunity by the State of New Jersey and controls the liability of New Jersey's public entities and their

---

[6] As the Court shall dismiss all of Plaintiffs' civil rights claims against Defendants without prejudice, the Court does not reach the issue of qualified immunity raised in the County Defendants' motion to dismiss.

employees under state law. *See, e.g.*, *Gaston v. New Jersey*, 298 F. App'x 165, 167-68 (3d Cir. 2008); *N.J. Stat. Ann.* § 59:8-1, *et seq.* The purpose of the NJTCA was to "re-establish[] sovereign immunity" and provide "broad immunity protection for public entities" and employees. *Ogborne v. Mercer Cemetery Corp.*, 197 N.J. 448, 457-59 (2009). Thus, under the Act "immunity is the rule, and liability the exception." *Gonzalez by Gonzalez v. City of Jersey City*, 247 N.J. 551, 570 (2021).

The County Defendants argue that they are immune from suit under state law for Plaintiffs' negligence claims because their actions are discretionary rather than ministerial in nature. As the Supreme Court has explained, under the Act, when a "public entity's or employee's actions are discretionary, liability is imposed only for palpably unreasonable conduct," while liability "for ministerial actions . . . is evaluated based on an ordinary negligence standard." *Id.* at 571 (internal quotations omitted). Under the Act, an action is considered discretionary where the defendant is engaged in "actual, high level policymaking decisions involving the balancing of competing considerations." *Id.* Ministerial actions are instead those "which a person performs in a given state of facts in a prescribed manner in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment upon the propriety of the act being done." *Id.* at 571-72. That such an action requires a level of operational judgment of when, where, or how to carry out an employee's responsibilities does not render that action discretionary. *Id.* at 572. Actions taken by low level employees can still be discretionary and subject to the Act's protections, however, where the individual employee's actions require "a significant thoughtful analysis and exercise of personal deliberations regarding a variety of factors." *Id.* Law enforcement officers thus engage in ministerial activity when they are negligent in offering aid to injured motorists or decide when and where to end a car chase, but act with discretion when engaged in such acts as determining the proper response to a domestic violence call. *Id.* at 572-73. The distinction between ministerial

15

and discretionary action is thus fact specific and turns on whether "the circumstances [are] thought to be such that reasonable [officers] in the position of the defendants could have differed about whether or how to act." *Id.* at 573.

In this matter, the direct actions of the supervisory and municipal County Defendants are discretionary in nature. Plaintiffs' claims against them based on their own direct actions arise entirely out of these Defendants' decisions as to what policies to adopt, what further training was required for their subordinate officers, and how best to combat the threat posed by the potential smuggling of illicit drugs into a county jail. That said, Plaintiffs' state law claims against the County Defendants—either alleged directly against the John Doe Corrections Officers or against their supervisors on a *respondeat superior* basis[7]—arise instead out of the alleged negligence of the officers in failing to properly watch, oversee, and secure Egner prior to his death in accordance with the rules in place inside the jail. These actions largely lack discretionary decision making and instead appear based on the current state of the complaint to be ministerial in nature. Thus, this Court will dismiss Plaintiffs' direct negligence claims against the supervisory and municipal Defendants at this time without prejudice because their actions were discretionary in nature and Plaintiffs have not pled facts sufficient to show that their actions were palpably unreasonable sufficient to surmount immunity.[8] The Court will deny Defendants' motion as to Plaintiffs' state law claims against the John Doe Defendants and as to Plaintiffs' supervisory claims for relief arising out of the failures of the John Doe Corrections Officers.

---

[7] It does not appear that Defendants have argued that the supervisory claims based on *respondeat superior* are in any way subject to immunity aside from their argument as to discretionary vs. ministerial action.

[8] Because the Court will dismiss these claims based on their discretionary nature, the Court need not address the argument that the policy decisions of Defendants amounted to the adoption of laws entitled to semi-legislative immunity under the NJTCA.

16

Defendants also contend that they are entitled to immunity because the NJTCA immunizes state entities and employees for the misdiagnosis or failure to diagnose substance abuse disorders and for determinations as to when to confine a person for drug dependence. *See* N.J. Stat. Ann. §§ 59:6-5; 59:6-6. This assertion, however, misses Plaintiffs' contention that it was not the decision of the John Doe Officers to determine whether or how to confine Egner, but that the standard jail rules in place required them to watch, confine, and secure him during his entry period into the jail, and the negligent failure to do so resulted in his overdose death. These statutes thus do not appear to apply to Plaintiffs' claims arising out of the actions of the John Doe Officers, and Defendants' motion is denied as to that argument.

Defendants also contend that they should be immune under the NJTCA because Egner's death was the result of another prisoner's actions. Under N.J. Stat. Ann. § 59:5-2(b)(4), neither "a public entity nor a public employee is liable for . . . any injury caused by . . . a prisoner to any other prisoner." It is true that the provision of drugs to Egner was the result of another prisoner's actions. Plaintiffs' negligence claims arising out of the corrections officers' activities, however, do not depend entirely on stopping or preventing Egner from interacting with and obtaining drugs from Hinton. Instead, those claims also assert that the officers failed to live up to their duty to watch over Egner, to keep him isolated in his cell during detoxification, and to regularly check up on him, which Plaintiffs assert led to his obtaining drugs, using them, and then overdosing and not being timely discovered. At the very least, the portion of the claim related to the failure to timely discover Egner after he overdosed is causally separate from the provision of the drugs by Hinton. The alleged negligence of the guards in that respect, at least, does not appear to be subject to immunity under the statute because the continued harm there arises from the failure to discover Egner rather than the initial overdose. Thus, the Court denies Defendants' motion to the extent they seek to have the negligence claim based on the officers' actions dismissed on this basis.

Finally, Defendants argue that Plaintiffs' wrongful death and survival actions should be dismissed as they are derivative of Plaintiffs' other claims. As Plaintiffs have a surviving negligence claim against the correction officer defendants and against their superiors based on respondeat superior, these derivative claims remain viable and live in relation to that negligence claim only. The Court will therefore not dismiss them at this time.

## IV.   CONCLUSION

For the reasons expressed above, Defendants' motion (ECF No. 7) is **GRANTED IN PART** and **DENIED IN PART**. All of Plaintiffs' claims against the County Defendants are dismissed without prejudice except for the negligence claims arising out of the actions of the John Doe Corrections Officer Defendants and the derivative survival and wrongful death claims related to those negligence claims. An order consistent with this Opinion will be entered.

_____
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE